Will the clerk please call the next case? 122-1878-WC, Kevin Cronk, son of Richard Cronk, deceased, appellant, by Thomas Lichten, v. Illinois Workers' Compensation Comm'n, Kimball Hill Homes, appellee, by Brian Reiderman. Mr. Lichten, you may proceed. Thank you, Justice Holdridge. My name is Tom Lichten. I'm appearing on behalf of Kevin Cronk, the son of Richard Cronk, deceased, the appellant in this case. Your Honor, and may it please the Court, I believe that the evidence in this case is overwhelming that the Commission made errors of both law and findings against the manifest weight of the evidence when it found that Richard Cronk did not suffer an accident that on December 6, 2006, when he suffered a fatal cardiac arrhythmia after shoveling snow at a house that was being readied for buyers to look at, shoveling snow for about 10 to 15 minutes, immediately after which he stopped and started suffering from D.I.B., difficulty in breathing. An ambulance was called. The ambulance arrived, and as Mr. Cronk was starting to tell the E.M.S. personnel what he had been doing, that is, shoveling snow and having difficulty in breathing, he went into full cardiac arrest and could not be revived. That took a period of maybe 10 to 12 to 15 minutes, so he immediately started suffering these difficulty in breathing symptoms while he was shoveling the snow, and immediately, or almost immediately after that, he went into full cardiac arrest within 10 minutes. The Commission found that Mr. Cronk did not suffer an accident that arose out of the course of his employment. However, as pointed out in particular by Commissioner Terrell's dissent, there's really no dispute that Mr. Cronk was doing work that was for his employer's benefit. He was shoveling snow in front of this house that had been built that was going to be sold to these prospective buyers, and he was shoveling snow because the people needed to not have snow on the walkway or the driveway, and maybe it was not a huge amount of area that he had to shovel according to what's in the coroner's report and also in the run report of the E.M.S., maybe 10 by 10 feet, 10 by 15 feet. We don't know what kind of shovel he used, if he had an ergonomic shovel, or we don't know how heavy the snow was, but that's not necessary. I think certainly under the McAllister case and also the Bagot case, which I've cited, there's no requirement that you have to show a certain amount of weight of snow, a certain amount of risk, a certain amount of exertion before something can be considered an accident. What are we supposed to do with Dr. Carroll's opinion that suggests that no amount of physical exertion had anything to do with this? Well, thank you for asking that question, Justice Hoffman. Actually, Dr. Carroll has two opinions, and the initial opinion was to the contrary of what you just quoted. The first letter that Dr. Carroll wrote was dated March 4, 2007, and in that letter, Your Honor, he is asked a question by Mr. Harrington, Respondent's Counsel at that time. Do you have an opinion, based upon a reasonable degree of medical certainty, whether the decedent's December 6, 2006 fatal cardiac arrest was causally related to his December 6, 2006 activities at work, or rather to an ongoing progressive cardiac condition or disease? If so, what is that opinion? Please provide the basis of that opinion. So then Dr. Carroll answers the letter, and he says, coronary artery disease certainly was an underlying condition. The death certificate references coronary atherosclerosis as a significant condition contributing to death. It is quite clear that physical activity does not cause coronary artery disease. Mr. Cronk's coronary artery disease was most likely due to genetic factors, low good cholesterol, and cigarette smoking. While we know physical exertion can precipitate an acute myocardial infarction, parenthesis heart attack, it appears this may not be the case here, at least not based on the death certificate. In addition, only shoveling a 10 by 10 section of driveway would not seem overly exertive to me. However, and this is what I want you to focus on, and Commissioner temporal relationship between his shoveling activities and his development of chest pain, it would make sense that the two were related. So what Dr. Carroll is saying is, yes, there was a connection. There was a causal connection between the shoveling and the letter. In that opinion, that statement is completely ignored by the commission's decision, which was the arbitrator's decision. They don't even mention that. That is the crucial thing that your honors, I believe, have to accept, that the commission just completely ignored that. Later, as you just mentioned, Justice Hoffman, in the second letter, Dr. Carroll is furnished with the autopsy report, which does show the approximately 50 percent narrowing of some of the coronary arteries and cardiomegaly. But Dr. Carroll still has a problem, because he already said that the cardiac basically arrest was related to the physical activities. So what does he do? He comes up with this, I guess you could call it a clever idea of what I would call an intervening cause. He says, well, none of this was due to the physical activities. What happened here was all of a sudden, after he started having these symptoms from shoveling snow, he has this, what I would call, intervening event where he suddenly and spontaneously goes into cardiac arrest from a totally independent cause, which is this cardiomegaly. So how likely is that to happen? A man, you've got a 50-year-old man, he's in apparent good health. He has a physical every year, has an EKG every year, not having any symptoms, doesn't know that he has any kind of problem, starts shoveling snow on December 6, 2006, starts to have shortness of breath, difficulty in breathing. And Dr. Carroll, in his first letter, says, yeah, it's related. The cardiac symptoms are related. And then in his second letter, he realizes he's got a problem. And so he says, well, no, they're not related. He just had this spontaneous, what would you call it? Spontaneous arrest, which was due to this cardiomegaly. And that can happen anytime. And it just happened to happen at that particular time. It was completely unrelated to anything that Mr. Cronk was doing. The court has held, in other cases, and I remember specifically Justice Holdridge said, court doesn't have to accept something that's patently unbelievable, a crazy coincidence or something like that. Let me ask you this then, counsel, does the inconsistencies that you point out in the letters, does that play into what the commission considers with respect to the credibility of this doctor? Yes, I think so, because they didn't even acknowledge that there was that inconsistency. If you look at the commission's decision, they don't even mention anything that Dr. Carroll said in his first letter. They just quote from the second letter. Did Dr. Tamalin's report wind up in evidence in this case? I'm sorry, did Dr. Tamalin's report what? Tamalin's report wind up in evidence in this case. Well, the original case was settled, but it is in evidence in this case. And Dr. Tamalin, I mean, even without Dr. Tamalin's opinion, what I just said, I think stands, but Dr. Tamalin does explain that. Well, according to the arbitrator's report, Tamalin opined that the event was brought on or aggravated by physical exertion because he developed symptoms consistent with a cardiac result of a review report that came in or that was obtained in the case brought by the wife that was settled. Is that not the case? How did it get into evidence in this case? I offered it into evidence and there was no objection. Okay, that was your exhibit one? Yes, your honor. Okay. And Dr. Tamalin just to, you know, as I say, it's not necessary that you accept this, but Dr. Tamalin explains that first of all, it is not possible to predict the degree of exertion that may or may not bring about cardiac ischemia or arrhythmia in a given individual, especially one with moderate coronary artery disease and hypertrophy of unknown etiology. Secondly, spontaneous cardiac arrhythmia is not manifest as several minutes of chest pain and shortness of breath. Spontaneous ventricular arrhythmias usually consist of either brief lightheadedness followed by loss of consciousness, or they are so sudden that they do not cause symptoms before arrest. So, I mean. All right, Mr. Lichten, assume we were to agree with you that Carol's opinions between the first and second report are internally inconsistent and Tamalin's report supports Carol's opinion in this first report. Now tell me why this particular petitioner is not barred from recovery because of 7A. And you rely, I guess, on drivers? Drivers, isn't that factually different that that petitioner was 25 years old or whatever and in school at the time of the death. The question in that case was, was the interruption of school attendance an event that would eliminate the payment of benefits? In this particular case, this man was not in school. He was over 18 years old and at the time of the death. And the question that has to be resolved is entitlement to compensation must be determined or should it be determined at the time of death as opposed to some event that occurs after death. I mean, what's your best position to say that it some event after death? Well, I think my best position is somewhat set out in the drives case. You're correct that it was, that's factually dissimilar because in that case, when the death occurred, she, the petitioner was in school, then she left school. Then a couple of years later, she went back to school. But section 7A says that under, if you're under, you're dependent if among other things, if you're under 25 and a full-time student at any accredited educational institution, it doesn't say that you have to be, when you hit, after you pass age 18, that you have to be in, in school at the time of the death. And the whole intent as explained by this court, although I had a different membership, in drives is to provide support for the children who are over 18 but still in school or go to school full-time. And to make exceptions, you know, based on the happenstance of, well, maybe you couldn't be in school because you didn't have enough money. So you had to stay out for a while or, or go back, or maybe there was some kind of disciplinary problem that you were out of school or, you know, maybe you were pregnant so you couldn't stay in school, something like that. I, I think that's a very, the drives case is very supportive of my position. Well, 7A has two sections that speak about age 18. The first section says that when determining who's liable, it says, then until the death, widower, widower, or until the youngest child shall reach 18, age 18, whichever shall come later, provided that if such child or children shall be enrolled as a full-time student in any accredited educational institution, the payment shall continue. And then later on, it says, if the employee leaves surviving any child or children under the age of 18 years of age, at the time of the death shall be entitled to compensation under paragraph A of this section. So it would occur to me, then it continues on for six years, it would occur to me that the statute and, you know, I'll concede to you, it's a horribly written statute as most of the sections of the act are, but, but it occurs to me that what they're intending to do is to provide compensation for someone who is over 18, but is engaged in accredited educational institution or instruction. And in this particular case, it just wasn't. And the last section seems to suggest that the entitlement to compensation must be determined at the time of death. And at the time of death, this petitioner was not entitled to compensation. I mean, I have difficulty with it. Drivers, there's no question that at the time of death, the petitioner drivers was entitled to compensation. She was under 18 and going to school. Right. And so the question was, was the fact that she had a break in her school attendance, the reason for, for ceasing to pay compensation. But I mean, both of them seem to be determined at time of death. I don't know. I can't get around it. And there's no other, there's no, no case on point. Well, drives is the only case that I can find that was anywhere. You're correct. And I think it's the dicta in there, in the whole idea of the, of the legislature and putting amending the law in 1975, which was long before people started taking gap years and so forth was to provide benefits. So the person, the child could become, get to get their education. And although I know it's not controlling or really maybe even slightly relevant in this case, Richard Cronk in his divorce agreement had agreed to provide tuition and other benefits to his son. If the son was enrolled in, I think, up till age 25 or 26, and of course he died. So that was the end of that. But I think that the whole thrust of 7a, of the amendments to 7a in 1975, and I certainly agree it could have been drafted a lot better is to provide support for a child who's suddenly deprived of his parents' livelihood or ability to support. Okay. The red light's been on for quite some time. Are there any other quick questions from the bench? No. Okay. Mr. Ratterman, you may respond. Good morning, your honors. Brian Ratterman for the Kelly Kimball Hill Homes. Your honor, the threshold inquiry in this case is accident. If the court affirms the commission's denial of accident, then all other issues will be rendered moot. The same is true for causation. If the commission's decision denying the causal link is affirmed, then the remaining issues are also moot. Only if these foundational issues are cleared by Cronk, then do we get to the tertiary issue of beneficiaries. It's our position that both accident and causation present questions of fact for this court and therefore are subject to the manifest weight of the evidence. There is no dispute that the beneficiary question is one of law and reviewed de novo. Much is made about the singular sentence in the commission's decision about the amount of snow to the extent that it is. Counsel, I don't think the amount of snow really makes a big difference. The big difference here is, as Mr. Lichten points out, Carroll gave an opinion in his first letter that the physical activity can bring this about. Tamley, I guess his name is, gave an opinion that was similar. The only thing that's different is in his second letter or second opinion, Carroll dances around the issue. And the commission relies on the dance as opposed to the two inconsistent positions, one by Carroll himself and the other by Tamley. And so the question becomes, does that rise to the level of against the manifest weight of the evidence? And tell me why not? I believe it does not, Your Honor, because when you look at Dr. Carroll's first report, he is saying that based on review of the death certificate only, that the cause of death, which was a cardiovascular hypertensive disease, he did not think, he said it was less suspect that physical exertion would be the cause of death. Except for one problem. He puts the caveat on there and says because of the temporal relationship between the physical exertion and the cardiac arrest. What did he say about that? What did he say in his report about the temporal relationship between these events? He says the temporal relationship between the snow shoveling and the onset of cardiac symptoms makes sense to a causal relationship. Okay. And then what did Tamlin say in his records review? Tamlin said he felt that an acute ischemia was brought on by physical exertion and that ischemia caused the fatal arrhythmia. Okay. So we've got Carroll saying it made sense to him. And we've got Tamlin saying that there is, it was caused by the physical exertion. And then Carroll backing off of the opinion ostensibly in his second report. And yet the arbitrator relies evidently upon the decision or the opinion in the second report. Why isn't that against the manifest way of the evidence when Carroll was inconsistent? Because I actually don't believe, your honor, that there is an inconsistency. When you look at the March report, what I think Dr. Carroll is expressing is a working hypothesis that there was an acute myocardial infarction, which is a heart attack. The heart attack could be caused by physical exertion. What Dr. Carroll says in conclusion in his March report is I would be happy to review the autopsy and amend my opinions as necessary. When he gets the full autopsy, which shows the necropsy results from Dr. Mitchell, he sees that there's cardiomegaly in a large part. There is some 50% blockage, but there is no acute thrombosis or occlusion. So that rules out the myocardial infarction. So he's taken the consideration of the anatomical structure of the heart, the cause of death listed on the death report and says, what actually happens here is the fatal arrhythmia was caused by the structure of the heart and was, therefore, spontaneous. So what he has done, I think, as a thoughtful and careful expert is obtain more information and revise his opinion as he thought the evidence required. So I don't see that there's really any inconsistencies when you look at his final report. I assume that we would agree with Mr. Licknett on the issue of accident and causation. Tell us what your opinion is about the application of 7A and why. Yes, thank you, Your Honor. I think that 7A, when we're considering issues of statutory construction, we have to give it effect to the intent of the legislator by looking at the plain and ordinary meaning. When we do that, I think there's a few words that stick out from 7A, which includes survivors that the employee leaves, survivors that shall be enrolled in college, and payments that shall continue. I think this shows a status determined at the time of accident and death. And as Your Honor's thoughtful questions to Mr. Lickton pointed out, we are also to look at the statute as a whole. And when you scroll from 7A down through 7B and 7C, what you see is an express term that defines dependency at the time of accident and death. The case law, which is cited in this record, all have one factual consistency, and that is the individuals found to be a beneficiary qualified at the time of death. I think in essence what you are at the time of accident or death is what you remain. So there's cases where somebody was not able to prove a beneficiary status at the time of death, and whatever happened afterwards, whatever they may have been able to prove afterwards, was not found to be relevant. And the same is true if they did qualify at the time of death, such as Ravenswood, where the under-18 child was later adopted. That later adoption did not disqualify an otherwise minor child who was a beneficiary by virtue of being under 18. And DRIVES factually stands for this very same proposition. The facts have been already stated, but it's maybe worth reiterating that this individual in DRIVES was a beneficiary qualified because she was enrolled at the time of her father's death. Do you consider the statute ambiguous? I do not, Your Honor. I think that the language shows clearly that it's contemplating what's happening at the time of death, and all the case law which has interpreted it thought the same way. In DRIVES, they said that there's no language which would allow for a severance or termination of benefits because of an interruption in the continuum. But in DRIVES, there was no question that at the time of the death, she was entitled to benefits because she was enrolled in school. So that doesn't solve our problems, whether the statute is or is not ambiguous, because in none of the other cases do either. So if the statute had said, you know, 18 years old at the time of death, no compensation unless you're enrolled in school, we wouldn't have a problem on our hands here, but it doesn't. Well, 7A, I— The reason why I asked the question is because the arbitrator cited a whole series of commission decisions which held that it has to be at time of death. And so now the question becomes, in interpreting the statute, do we give deference to the commission's interpretation of an ambiguous statute? Well, I think this court is given de novo review of this question. So you say it's not ambiguous, that's it, we decide. I think that the way the law begins, 7A, starts with survivors that the employee leaves. An entire reading of the statute reflects a determination at the time of death. Case law has all interpreted the same, whether that's qualifying as a survivor or not qualifying as a survivor. What happens post-mortem has not ever been found to be relevant. I think that should be the same result here because of the factual consistencies amongst all the cases cited. And I don't think that the judgment decree either, which was brought forth as maybe creating a legal obligation for support, changes the outcome. The judgment decree actually terminates the decedent's support obligation on the emancipation of petitioner. Emancipation is defined therein as reaching the age of 18 or graduating from the college enrollment portion of the decree only refers to college expenses and the like, tuition, books, et cetera. But that's not what's being sought here. The judgment decree also says that the obligation for college expenses is conditioned upon decedent's ability to pay them. And it also says that the obligation goes to age 26. There are so many inconsistencies between what is being requested as far as benefits go, what the decree says, and there's no citation that a judgment decree creates a legal obligation. So I don't think that that falls within 7-8's sort of catch-all that Ravenswood and Drives both define the legal obligation to say. Let me ask you a question with regard, kind of going back, with regard to the requirement, let's say, just throw a term out there, the requirement that the survivor, the child be enrolled at the time of the death. In this situation, I believe there's testimony that Mr. Cronk had decided to take a gap year, which is more common now than perhaps in 75. I think somebody else suggested that. But if it were not that, if that weren't the situation, in other words, he graduated from high school and within a week of his graduation, his father died and he was not fully enrolled. He was in the process of deciding to enroll in the community college or university. Is the act truly, in your opinion, set up to prevent that situation from being compensated or to have his college paid for? Or is it for someone who had no intention of going to college and then, you know, because they couldn't afford it or whatever, and then have this happen and then all of a sudden now they change their mind, they're going to go back to school. I'm not sure what the intent of the act really is at this point. Yeah, I mean, I think that might have been a hypothetical fact pattern presented by the appellant in the brief. Well, the facts of this case were the man died in December of 06. Is that not the case? And the petitioner testified that he never applied for school until August of 07. Is that not true? Did he testify to that? Your Honor, I don't recall specifically what he testified as to his date that he enrolled. I'm sorry. That's probably consistent, though, with the testimony that he had taken a gap year. So, wait a minute, how do you take a gap year if you've never enrolled? Gap year being not enrolling for college prior, you know, right immediately after high school. Yeah, well, what does a gap year have to do with the interpretation of 7A? Well, that's kind of what I'm asking. Your Honor, I believe it has nothing to do. The act requires enrollment. It doesn't require attendance. It says enrollment. So, the high school kid, excuse me, who enrolls during their senior year would qualify as long as they're enrolled for full time at an accredited institution. The timing, you know, the closer we get to an application or the closer we get the application to death maybe seems harsh, but I don't think that that would necessarily change how the statute reads. There's an issue of finality that all parties are entitled to when we're trying to an approved decision or an approved contract which constitutes a commission's decision or a case that is brought to trial and rendered a decision after hearing. To be able to identify all beneficiaries at that time, as well as to calculate the proportionate share requires that we have finality when we're doing this. If somebody can become a springy beneficiary by their postmortem actions, we lose those sort of opportunities for finality. May I ask then, I'm hearing you say, well, if the child had just graduated from high school at the time that the parent passes away, but they weren't enrolled, then it doesn't matter if it was a week after graduation, they're not going to qualify for benefits, correct? Because there needs to be finality, correct? In short reply, yes. I think because the plain language of the statute says enrolled, whether they've enrolled five years or five days after death, the postmortem actions are not a consideration based on the language in the act. And a different question. If the legislature says at a point in 7A, where it's giving, as I read it, children under 18 at the time of death, they get six years of compensation. And if in 7C, the statute says that it's people like parents, I think, and people who are otherwise qualified to get benefits at the time of the accident, that has the limitation at the 7, this portion of 7A to the time of death or the date of the accident. C uses at the time of the accident. I think we are required to look at the statute as a whole. If they use that term in one place, they show that they know that we're going to limit it here. And if they use it in another place, they want to limit it there. And if they don't use it in the third place, doesn't that mean they didn't intend to limit it? Why isn't that the plain meaning? We give the legislature the full effect of their language. Because I believe that the language expresses their intent. That is a presumption. I believe that their intent has been expressed throughout by the verbiage that they've used, leaves, shall be, payments continue, and later defining, as you pointed out in 7C, a determination at the time of accident. If the legislator believed there to be some sort of inconsistency in the plain meaning of their language, drive was decided, I believe, about 30 years ago. And there's been no amendments to the act to address the particular problem, which we're discussing here today. I think if there was an intent to allow for postmortem actions to qualify someone as beneficiaries, the act could be written in a way. Okay, the red light has been on for a little bit. Any other questions from the bench? No? Okay. Mr. Licton, you may reply. Mr. Licton, I kind of fed counsel of softball that you didn't pick up. Could you tell me whether you think this statute is ambiguous? I don't know if I would use the word ambiguous. It certainly could be a lot clearer, but I think that, I mean, I think Justice Mullen's question is actually very educational for me to point out that they, in 7C, the legislature specified it had to be as of the time of death, but not in 7A. So, I mean, I guess if ambiguity means lack of clarity, I would agree that it's ambiguous. But I think that this court, in the drives case, well, I'll just read this, which I quoted in my brief. We cannot speculate on the intent of the until age 25 avoids a host of problems. While the claimant here acted volitionally, problems could arise with breaks in the educational process due to extended illness, pregnancy, need to earn money to continue schooling, to disciplinary suspension by the school. The list is circumscribed only by one's imagination. Each one would require the commission and the courts to do too much soul searching and legal juggling to reject unworthy pleas and to allow the opposite. The statute would then become so barnacled with exceptions as to be meaningless. I think, well, you know, a statute is only ambiguous if it's susceptible to two was not reasonable. And therefore, they didn't apply it. But I asked the question because I'm more concerned with whether we give deference to the way the commission has interpreted this statute. We give them no deference if this is an unambiguous statute. But if it's an ambiguous statute, then we have to accord them some deference based upon the Supreme Court's belief that they have some expertise in this area. Well, I guess my feeling as I was trying to wrestle with the word ambiguous is it really isn't ambiguous given the whole intent of the law as I think the court sees it and saw it, or at least saw it in the Dries case. And I don't think the court needs to, I mean, we know it's de novo review, but I don't think there's any deference that's required to what the commission may have decided in the past. And I don't know that they really even had this kind of situation that they were dealing with. Well, the arbitrator quoted three commission decisions where they had indicated that it must be determined at the time of death. But I can't recall offhand what those decisions, but I think that maybe I dealt with it in my brief that those were not really the same situation at all. And I just don't recall, I'm sorry, but I think the statute is clear enough that you don't have to be in school at the time of death. It's not a requirement and it's set out in 7A and why would it be? Because the intent is to keep benefits going until you're age 25, if you're enrolled full time in an accredited education. Well, if a petitioner is not enrolled at school at the time of death and he's age 18, when do benefits start under your theory? When he is from the time of the death until he's enrolled. That's correct. And then the benefits start, how long do they last once they're enrolled until he's 25? Yes, as long as he's still enrolled, any period of time that he's still enrolled, the statute says, uh, if he's, if as long as he's under 25 and a full-time student at any accredited educational institution. Okay. Thank you, your honor. Any further questions from the bench? No. Okay. Thank you, counsel, both for your arguments in this matter. This morning, it will be taken under advisement.